NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250075-U

NO. 4-25-0075

IN THE APPELLATE COURT

FILED
April 14, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ROBERT CRAIGG DEAR, | ) | No. 24CF630 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The State proved defendant guilty beyond a reasonable doubt.

(2) The trial court did not abuse its discretion in denying defendant's request to continue his trial to obtain substitute counsel, who was not ready, willing, and able to appear.

(3) Defendant's trial counsel did not perform deficiently.

(4) The trial court conducted an adequate inquiry into defendant's *pro se* claims of ineffective assistance of counsel.

¶ 2     Defendant, Robert Craigg Dear, was convicted by a jury of (1) home invasion

(720 ILCS 5/19-6(a)(2) (West 2024)), (2) criminal trespass to a residence (720 ILCS 5/19-4(a)(2)

(West 2024)), and (3) battery (720 ILCS 5/12-3(a)(1) (West 2024)). On appeal, defendant argues

his convictions for home invasion and criminal trespass to a residence should be reversed

because the State did not prove him guilty beyond a reasonable doubt. He additionally argues he

is entitled to a new preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), because the trial court failed to conduct an adequate inquiry into his ineffective-assistance allegations and appoint new counsel. Finally, defendant contends the court deprived him of his right to counsel of his choice and that trial counsel rendered ineffective assistance. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                              A. The State's Charges

¶ 5            In June 2024, the State charged defendant with one count of home invasion (720 ILCS 5/19-6(a)(2) (West 2024)), one count of criminal trespass to a residence (720 ILCS 5/19-4(a)(2) (West 2024)), and one count of battery (720 ILCS 5/12-3(a)(1) (West 2024)).

¶ 6                                B. Jury Trial

¶ 7                             1. *Motion to Continue*

¶ 8            Defendant's jury trial commenced in September 2024. On the first day of the trial, defendant indicated he no longer wanted to be represented by his appointed counsel, claiming counsel was not affording him a "fair defense." The trial court consulted with defense counsel, and counsel confirmed that he had reviewed the discovery materials, had spoken with defendant about the case, and was prepared for trial. Defendant, however, requested the court appoint different counsel until he "[got his] settlement in so [he could] get private counsel." Defendant believed he would receive his settlement money within "the next three weeks to a month, something liking [*sic*] that." When asked if substitute counsel was "retained or prepared to enter this week," defendant answered, "No." After considering appointed counsel's preparedness for trial, the timing of defendant's request, and defendant's failure to secure substitute counsel, the court denied defendant's request to continue the matter and proceeded to *voir dire*.

¶ 9                              2. *Rebecca Altshue*

¶ 10        During trial, Rebecca Altshue testified she lived in a mobile home in Bloomington, Illinois, which she owned. Altshue dated defendant "for about a year." Over the course of their relationship, defendant resided with Altshue "off and on" for "almost nine months," and he paid the lot rent twice. Altshue testified her relationship with defendant ended on June 14, 2024. That same day, Altshue had defendant move out due to their arguments and defendant's abusive behavior. Defendant "took everything with him" when he moved out, except for his and Altshue's "mutual dog."

¶ 11        Altshue testified she did not speak to or see defendant until two days later, when she "heard a loud bang" while sitting in her bedroom with her ex-husband, Brandon Thomas. She then saw defendant running into the house and "coming after [her]" with a screwdriver in his hand before Thomas intervened. Altshue "was not expecting [defendant] to be at [her] house," nor had she invited him over. Altshue testified the door was locked before defendant broke in. During the ensuing melee, Altshue managed to escape the trailer and "ran down the street screaming and talking to 911 about what was going on."

¶ 12                          3. *Franklin Ramirez*

¶ 13        Franklin Ramirez lived next door to Altshue. He testified that he and defendant got on well as neighbors and that they spoke "a few times" on the days leading up to the home invasion. Ramirez also saw defendant outside Altshue's trailer earlier in the afternoon before the break-in and told him "to keep his head up and to just keep doing the right thing." Later that night, Ramirez "woke up to a big bang of sorts." He looked out his window but could only see defendant and Altshue's dog "running back and forth in the street." He then "ran outside to see what was going on" and found Altshue "out in front of her place visually upset on the phone."

¶ 14        When the police arrived, they went through footage from a surveillance camera

Ramirez had outside his home. Ramirez explained the camera was motion activated and it only recorded "a vehicle coming down the road and parking down the street." Ramirez could not see anyone getting out of the truck in the video. At the end of the footage, screaming and yelling could be heard. Because the camera was only motion activated and not noise activated, it did not catch all the noises he heard that night.

¶ 15                                   4. *Robert Chance Hilliard*

¶ 16         Officer Robert Chance Hilliard of the Bloomington Police Department responded to Altshue's residence on the night of the home invasion. When he arrived, the door "appeared to have signs of forced entry from the outside as if somebody was breaking *** into the home." He observed injuries on Thomas's face and body. Hilliard also went into Altshue's bedroom, which showed signs of a struggle, and took a blue screwdriver from the room. He then searched a truck belonging to Tynan New, which had been left several houses down from Altshue's trailer. Inside the truck, Hilliard found defendant's birth certificate, Social Security card, various personal items, and several piles of clothing.

¶ 17                                   5. *Tyler Elston*

¶ 18         Officer Tyler Elston of the Bloomington Police Department testified he searched for defendant the day after the home invasion. He eventually drove by New's residence and saw defendant sitting on the front porch. When Elston returned to New's house, defendant was gone. Officers then arrested defendant after spotting him hiding in some brush a few trailers away.

¶ 19                                   6. *Kevin Steck*

¶ 20         Officer Kevin Steck of the Bloomington Police Department testified he interviewed defendant following his arrest. Steck's interview with defendant was videotaped and submitted into evidence. During their interview, defendant acknowledged he and Altshue were

having problems. His living arrangements with Altshue were turbulent; defendant claimed she constantly vacillated between telling him to "come home" and "stay away." He stayed with a friend the night before the home invasion. The next night, defendant returned to Altshue's trailer because he thought, "by chance, that because she had spent the day gone, then maybe she wanted [him] to come back." He intended to call Altshue "before [he] walked in and everything like that," but that was before he saw Thomas's truck. Defendant told Steck he walked "towards the front of the house," but he did not walk up the steps or even make it to Altshue's front door. He called Altshue "a fucking slut" before Altshue and Thomas "came out the door and they started their shit, and that's when [defendant] took off." But when Steck asked how things escalated while defendant was inside Altshue's trailer, defendant said that Thomas "got up out of that bed in his boxers and came after [him]." Defendant denied breaking in the front door and accused Altshue and Thomas of being capable of "mak[ing] it look like it was all [him]." Defendant initially denied striking Thomas, but he eventually acknowledged he "might have swung a couple of times." Defendant was uncertain if he actually struck Thomas.

¶ 21                  7. *Defendant*

¶ 22        Defendant testified on his own behalf and explained his living arrangements since his release from prison in June 2023. First, he "paroled to a friend's house in Tazewell County" for a "couple days." He then moved in with his daughter before relocating "to [Altshue's] house in August." Defendant claimed he continuously resided there until June 2024. He also claimed the door of Altshue's trailer had always been broken and he always had to lift it for it to latch.

¶ 23        Defendant testified he went to work on Friday, June 14, 2024, but he left early for an appointment. Afterwards, defendant "went home" to Altshue's trailer. He then video-called Altshue while she was out of town. Defendant claimed Altshue asked him for some money to

return home, so he sent her $300 on CashApp to get whatever she needed. According to defendant, he was the sole provider in Altshue's household, and he paid all the bills. When Altshue returned home the following afternoon, defendant claimed they spent the rest of the day together.

¶ 24   Defendant and Altshue woke up the morning of June 16, 2024, "in good spirits, happy, [and] loving each other." They discussed their plans for the day. However, they eventually had a disagreement and "parted ways." Altshue told defendant "she wanted her space," so defendant "went [his] way." Later that day, Altshue texted defendant asking for more money and left town again. Defendant let himself into Altshue's residence while she was away and took their dog outside. He then went to a friend's house for dinner. Defendant testified he returned to Altshue's trailer that night to go to bed because he had work in the morning. When he got there, he saw an unknown truck in the driveway and saw Altshue and Thomas through the bedroom window. Defendant then "hit the side of the trailer as hard as [he] could and [he] called [Altshue] a slut." Altshue opened the door without saying anything, and Thomas came up behind her. Defendant asked Thomas "who he thought he was in [defendant's] house fucking [defendant's] old lady" before Thomas "charged after [him]" and put him in a "chokehold." Once defendant "got free," he "just went walking."

¶ 25   Defendant claimed he was "high and drunk" when he spoke to Steck. Defendant admitted he told Steck multiple versions of what happened on the evening he confronted Altshue. He also admitted his testimony at trial was different from what he originally told Steck. Defendant denied telling Steck that he and Altshue broke up before the home invasion and that he had been staying at a friend's house before the incident. Finally, defendant denied telling Steck that there had been no physical altercation and that he did not enter Altshue's residence

when he confronted her and Thomas.

¶ 26                              8. *Defense Counsel's Closing Argument*

¶ 27          During closing arguments, defense counsel recounted the evidence presented at trial and asserted defendant's testimony was "that he did not force entry into that residence." Counsel then went on, stating:

> "I think it's important to note that [defendant] did have the
> authority to enter, that this was his house. He had lived there for
> several months. He had been sharing expenses. He paid the lot
> rent, and he was a joint tenant with Rebecca Altshue. He hadn't
> been evicted. There was no court order that he stay away from the
> residence. You heard the testimony of Franklin Ramirez who said
> that he had conversations with [defendant] on June 16th, June 15th
> at that location.
>
> So whether [defendant] entered or not, *** he had the
> authority to be there. He had the authority to make entry, and he
> can't be found guilty of trespass or home invasion."

Defense counsel then gave additional remarks and concluded his closing argument.

¶ 28          The jury ultimately found defendant guilty of all counts.

¶ 29                              C. *Krankel* Proceedings

¶ 30          Subsequently, the circuit clerk filed a *pro se* letter from defendant alleging he "was given Ineffective Assisstance [*sic*] of Counsel" in several respects. In relevant part, defendant alleged his trial counsel refused to present evidence showing defendant received mail at Altshue's residence and that they corresponded after defendant invaded her home. Defendant

further alleged counsel failed to call several witnesses from a list defendant submitted to him, cite caselaw submitted to him by defendant, and adequately impeach Altshue about not speaking to defendant after the date of their breakup.

¶ 31 Upon the trial court's inquiry, defendant accused counsel of not helping him. Defendant told the court that when he met with counsel at the first pretrial hearing, he "verbally told him" of several witnesses he wanted to testify. He also sent counsel a letter before trial with the names and addresses of the witnesses, as well as "a list of exhibits for evidence."

¶ 32 Defense counsel disagreed with defendant's accusations that he "didn't help him," and counsel "[stood] by the decisions that [he] made." He recalled conferring with defendant multiple times prior to trial, though he did not "recall the duration of those conversations." He insisted he "was thoroughly prepared" for defendant's trial. Contrary to defendant's assertion that counsel failed to present evidence that Altshue's residence was his dwelling place and that he still received mail there, counsel told the trial court the issue was "thoroughly explored and argued." In fact, counsel recalled that it was "precisely the argument that [he] made at trial." Counsel explained the evidence "that [defendant] had been paroled there and that he was receiving mail there was all evidence that he resided there and therefore his entry could not be considered unlawful." He "elicited evidence and testimony from *** Altshue" that defendant "had resided at that address for several months, that he had assisted in paying for the household expenses including the lot rent, and that that had been his place of residence." Defendant also testified to those particulars.

¶ 33 Regarding defendant's concern about counsel's decision not to subpoena any of defendant's proposed witnesses, counsel remarked that he "considered [defendant's] witnesses, and [he] determined that none of them would have had testimony that was particularly relevant

or would have tipped the case in his direction." Counsel explained the "fact that the Defendant had paroled to [Altshue's] address was established through his testimony," and "the other witness' testimony would have been cumulative in terms of *** [defendant's] prior residency there which was conceded by Miss Altshue and was confirmed by his testimony."

¶ 34　　　　　The trial court, after considering the contents of defendant's *pro se* letter, the relevant aspects of the record, the additional information provided at the hearing, and counsel's responses, ultimately found defendant's allegations of ineffective assistance either pertained to trial strategy or lacked merit. Therefore, the court declined to appoint new counsel.

¶ 35　　　　　The matter then proceeded to defendant's sentencing hearing. Prior to imposing its sentence, the trial court pointed out the criminal trespass and battery counts would merge into the home invasion count, and the court ultimately sentenced defendant to 16 years' imprisonment.

¶ 36　　　　　This appeal followed.

¶ 37　　　　　　　　　　　　　II. ANALYSIS

¶ 38　　　　　On appeal, defendant argues his convictions for home invasion and criminal trespass to a residence should be reversed because the State did not prove him guilty beyond a reasonable doubt. He additionally argues he is entitled to a new preliminary *Krankel* inquiry because the trial court failed to adequately inquire into his ineffective assistance allegations and appoint new counsel. Finally, defendant contends the court deprived him of his right to counsel of his choice and that trial counsel rendered ineffective assistance.

¶ 39　　　　　　　　　　　　A. Motion to Continue

¶ 40　　　　　Defendant argues the trial court erred by denying his request to continue his trial to hire substitute counsel. Defendant recognizes he did not preserve this issue for review and

asserts we should review the issue under the plain-error doctrine (see Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). The State contends the court did not err.

¶ 41 The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

"(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

We begin a plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189. If error did occur, this court then considers whether either of the two prongs of the plain-error doctrine has been satisfied. *Sargent*, 239 Ill. 2d at 189-90. Under both prongs, the defendant bears the burden of persuasion. *Sargent*, 239 Ill. 2d at 190. Here, defendant contends his claim is cognizable under the second prong.

¶ 42 The sixth amendment (U.S. Const., amend. VI) guarantees a criminal defendant the right to assistance of counsel, which includes the right to effective assistance of counsel and the right to select and be represented by one's preferred attorney. *People v. Rivera*, 2013 IL 112467, ¶ 37. However, "[t]he right to counsel of choice is not absolute and is circumscribed in several respects." *Rivera*, 2013 IL 112467, ¶ 37. One such respect is "where the exercise of that claimed right would delay or impede the effective administration of justice." *People v. Barrow*,

133 Ill. 2d 226, 252 (1989).

> " '[W]hile the right to select and be represented by one's preferred
> attorney is comprehended by the Sixth Amendment, the essential
> aim of the Amendment is to guarantee an effective advocate for
> each criminal defendant rather than to ensure that a defendant will
> inexorably be represented by the lawyer whom he prefers.' "
> *Rivera*, 2013 IL 112467, ¶ 37 (quoting *Wheat v. United States*, 486
> U.S. 153, 159 (1988)).

The court must balance the defendant's right to choose his or her counsel against the need for efficient and effective administration of justice. *People v. Curry*, 2013 IL App (4th) 120724, ¶ 48.

¶ 43        The determination of whether to grant or deny a continuance for substitution of counsel rests within the trial court's discretion and will not be overturned absent an abuse of that discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000). A trial "court abuses its discretion when its ruling is arbitrary 'or when no reasonable person would take the view adopted by the trial court.' " *People v. Pope*, 2020 IL App (4th) 180773, ¶ 28 (quoting *People v. Bates*, 2018 IL App (4th) 160255, ¶ 60). In evaluating the trial court's exercise of its discretion, the reviewing court considers several factors, including (1) the movant's diligence, (2) the defendant's right to a speedy, fair, and impartial trial, and (3) the interests of justice. *Segoviano*, 189 Ill. 2d at 245. However, it is well-established a trial court "will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel." *Segoviano*, 189 Ill. 2d at 245. This court has further recognized a trial court does not abuse its discretion by denying a motion to continue to allow for substitution of counsel " 'where

new counsel is unidentified or does not stand ready, willing, and able to make an unconditional entry of appearance on [the] defendant's behalf.' " *Curry*, 2013 IL App (4th) 120724, ¶ 49 (quoting *People v. Childress*, 276 Ill. App. 3d 402, 411 (1995)).

¶ 44    In support of his argument, defendant cites *People v. Adams*, 2016 IL App (1st) 141135, ¶¶ 16-17, where the reviewing court reversed the trial court's denial of the motion to continue to substitute counsel because the court completely failed to make any kind of inquiry into the defendant's request to continue. But in this case, the court did conduct an inquiry into defendant's request to continue his trial to hire counsel. Thus, we find that case distinguishable.

¶ 45    Defendant also cites *People v. Bingham*, 364 Ill. App. 3d 642, 644 (2006), where this court reversed the trial court's judgment because the court violated the defendant's right to his choice of counsel by erroneously denying the defendant's motion for continuance without conducting an adequate inquiry into the defendant's request. When the defendant's case was called for trial, the defense counsel made a motion to continue to obtain new counsel and explained the defendant sought to be represented by out-of-town counsel, who was representing the defendant in other pending matters. *Bingham*, 364 Ill. App. 3d at 644. The prosecutor stated he had received a message from the out-of-town counsel the day before and noted the State was " 'most anxious to proceed in this matter.' " *Bingham*, 364 Ill. App. 3d at 644. Without any further inquiry, the trial court denied the motion to continue. *Bingham*, 364 Ill. App. 3d at 644. In reversing the trial court's denial of the motion to reconsider, this court noted the following: (1) the out-of-town attorney the defendant sought for representation contacted the prosecutor the previous day, (2) the case progressed quickly and had been pending for only three months, (3) the defendant had not filed any prior continuances or made any pretrial motions, and (4) the record did not indicate the defendant made any prior attempts to delay the proceedings or the

purpose of the defendant's request was dilatory. *Bingham*, 364 Ill. App. 3d at 645.

¶ 46        This court later emphasized that our decision in *Bingham* focused on the trial court's failure to conduct an inquiry into the circumstances and purposes of the defendant's motion. *Curry*, 2013 IL App (4th) 120724, ¶ 51. " '*Bingham* should be understood as concluding, under the particular circumstances of that case, that an inquiry by the trial court might well have disclosed that the attorney the defendant identified by name (whose involvement in the case the prosecutor corroborated) would, in fact, be "ready and willing" substitute counsel.' " (Emphasis omitted.) *Curry*, 2013 IL App (4th) 120724, ¶ 51 (quoting *People v. Montgomery*, 373 Ill. App. 3d 1104, 1111 (2007), *abrogated on other grounds by People v. Ayres*, 2017 IL 120071). However, our decision in *Bingham* did not modify the long-standing rule that a trial court "does not abuse its discretion by denying a defendant's motion for continuance where new counsel does not stand ready, willing and able to make an unconditional entry of appearance *instanter*." (Internal quotation marks omitted.) *Curry*, 2013 IL App (4th) 120724, ¶ 51. Thus, where a trial court conducts an inquiry into the circumstances of the defendant's motion and "those circumstances demonstrate substitute counsel does not stand ready, willing, and able to make an unconditional entry of appearance on defendant's behalf, a court does not abuse its discretion by denying a defendant's motion for continuance to obtain substitute counsel." (Internal quotation marks omitted.) *Curry*, 2013 IL App (4th) 120724, ¶ 51.

¶ 47        In *Curry*, we found *Bingham* distinguishable because the trial court correctly inquired of counsel to determine the factual basis surrounding the request for a continuance, which revealed the defendant had paid the substitute counsel a retainer, the substitute counsel had contacted the prosecutor, and the substitute counsel indicated he would not enter an appearance unless the case was continued. *Curry*, 2013 IL App (4th) 120724, ¶¶ 51-52. We

concluded the trial court did not abuse its discretion by denying the defendant's motion for a continuance because the substitute counsel was not willing to make an unconditional entry of appearance on the defendant's behalf. *Curry*, 2013 IL App (4th) 120724, ¶ 52.

¶ 48    We continue to follow *Curry*. In this case, the trial court made an inquiry into defendant's motion for continuance and considered appointed counsel's preparedness for trial, as well as the timing of defendant's request. Defendant, unhappy with his appointed counsel's performance, requested the court delay proceeding until he "[got his] settlement in so [he could] get private counsel." Defendant believed he would receive his settlement money within "the next three weeks to a month." Defendant did not identify who he was seeking as substitute counsel, and when asked if substitute counsel was "retained or prepared to enter this week," defendant answered, "No." As such, defendant did not have a substitute counsel "ready, willing, and able to make an unconditional entry of appearance." (Internal quotation marks omitted.) *Curry*, 2013 IL App (4th) 120724, ¶ 51. Thus, the court did not abuse its discretion by denying defendant's request to continue for the substitution of counsel. And having found no error, we need not address defendant's assertion of plain error.

¶ 49                     B. Sufficiency of the Evidence

¶ 50    Defendant next argues his convictions for home invasion and criminal trespass must be reversed because the State presented insufficient evidence to convict him of the offenses. "When the sufficiency of trial evidence is at issue, a court of review must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *People v. Synowiecki*, 2023 IL App (4th) 220834, ¶ 51. A reviewing court does not retry the defendant when a challenge to the sufficiency of the evidence is presented. *People v. Baker*, 2022 IL App (4th)

- 14 -

210713, ¶ 35. "It is the trier of fact who 'determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence.' " *Baker*, 2022 IL App (4th) 210713, ¶ 35 (quoting *People v. Swenson*, 2020 IL 124688, ¶ 36). "All reasonable inferences are drawn in favor of a finding of guilt," and a conviction will be set aside "only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Swenson*, 2020 IL 124688, ¶ 35.

¶ 51 We note initially that, because defendant was not sentenced on the criminal trespass conviction, which merged with the home invasion conviction, we lack jurisdiction to address the validity of defendant's unsentenced conviction. This is so because, except as provided by rule, the appellate court's jurisdiction is limited to reviewing final judgments (Ill. Const. 1970, art. VI, § 6), and a judgment does not become final in a criminal case until a sentence is imposed. *People v. Relerford*, 2017 IL 121094, ¶ 71.

¶ 52 In *Relerford*, the Illinois Supreme Court held that the appellate court lacks jurisdiction to consider the merits of a guilty finding on a properly merged count when no sentence was imposed on the merged count. *Relerford*, 2017 IL 121094, ¶ 75. To the extent the appellate court has any jurisdiction to address the nonfinal convictions, that jurisdiction is limited to ordering a remand for imposition of sentences on the lesser convictions. *Relerford*, 2017 IL 121094, ¶ 75.

¶ 53 In this case, we lack jurisdiction to address the sufficiency of the evidence of defendant's criminal trespass conviction because that conviction merged into the conviction of home invasion, for which defendant was sentenced. And while defendant attempts to argue *Relerford* allows for a review of unsentenced convictions, *Relerford* made it clear that, at most,

all this court could do is remand to impose a sentence on the lesser conviction if warranted. See *Relerford*, 2017 IL 121094, ¶ 75. This court could not review the sufficiency of the evidence. See *People v. Jamison*, 2018 IL App (1st) 160409, ¶¶ 33, 37; *People v. Cabell*, 2023 IL App (2d) 220238-U, ¶ 18.

¶ 54    As for the conviction for which defendant was sentenced, defendant contends that the evidence was insufficient to prove his guilt of home invasion beyond a reasonable doubt because the proof of an element of the offense, that he entered the dwelling place of another, was lacking.

¶ 55    To prove defendant guilty of home invasion as charged, the State had to prove defendant, who was not a police officer and lacked authority, knowingly entered the dwelling place of another when he knew or had reason to know that one or more people were present and intentionally caused any injury to anyone inside. 720 ILCS 5/19-6(a)(2) (West 2024). When assessing whether a defendant who is or has been in a relationship with the victim entered the dwelling place of another, we "look beyond the form of the tenancy relationship [in order] to determine the substance of the relationship, considering formal legal documents, informal arrangements, and any other evidence" indicating whether the defendant lived with the victim or somewhere else. *People v. Delacruz*, 352 Ill. App. 3d 801, 810 (2004). That is, we consider any tenancy interest the defendant has in the premises in addition to any possessory interest in the home. See *People v. Howard*, 374 Ill. App. 3d 705, 712 (2007).

¶ 56    Here, when viewed in a light most favorable to the State, the evidence was sufficient to show that defendant did not enter his own dwelling place. Altshue and defendant were never married, and Altshue was the sole owner of the trailer. Defendant's living arrangements with Altshue were inconsistent at best; he stayed with her "off and on" for "almost

nine months." She had defendant move out permanently when their relationship ended, and defendant took all his belongings with him, except for their mutual dog. There was no evidence presented to the jury that defendant had a key to Altshue's trailer. Altshue testified the door was locked on the night defendant broke in and she had not authorized defendant to enter. Defendant told Steck he had been staying elsewhere before the home invasion, broke in instead of using a key, and then fled the scene. This is further evidence Altshue's trailer was not defendant's dwelling place and he was not authorized at that time to enter it. To the extent testimony from defendant indicated otherwise, the jury was free to judge the credibility of his statements and weigh that information as it saw fit. The jury determined the State sufficiently proved the offense of home invasion and, because there were numerous facts to reasonably support that conclusion, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Swenson*, 2020 IL 124688, ¶ 35; *Baker*, 2022 IL (4th) 210713, ¶ 35.

¶ 57                              C. Ineffective Assistance of Trial Counsel

¶ 58          Next, defendant argues defense counsel "muddied the waters for the jury" by "conflat[ing] the question of authority with the question of dwelling and residence." See 720 ILCS 5/19-6(a) (West 2024). Defendant's convoluted argument boils down to the assertion that counsel should have done more "to dispel the notion encouraged by the State that [defendant] needed Altshue's permission to be inside the home." (Emphasis omitted.)

¶ 59          A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. In other words, a defendant must show both (1) "counsel's performance was objectively unreasonable

under prevailing professional norms" and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *People v. Moore*, 2020 IL 124538, ¶ 29. " 'The likelihood of a different result must be substantial, not just conceivable.' " *Pope*, 2020 IL App (4th) 180773, ¶ 63 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 60        "Effective assistance of counsel refers to competent, not perfect representation." (Internal quotation marks omitted.) *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 52. "Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective." *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10. "The decision to rely on one theory of defense to the exclusion of other theories of defense is a matter of trial strategy." *People v. Clark*, 207 Ill. App. 3d 439, 450 (1991). Matters of trial strategy, including "what evidence to present, whether to call a certain witness and what theory of defense to pursue," are generally immune from claims of ineffective assistance of counsel. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 74.

¶ 61        In this case, defendant suggests his trial counsel's performance was objectively unreasonable because he "should have argued that Altshue's authority was irrelevant because [defendant] did not need permission or an invitation from anyone to enter his own home." But that is *precisely* the defense that counsel pursued throughout defendant's trial—that defendant had the authority to enter the trailer and that it was his residence. In fact, he argued it vigorously during closing arguments, asserting it "was [defendant's] house," he "ha[d] the authority to

enter," and nothing—a court order or otherwise—prohibited him from entering. Counsel did not misapprehend the law like defendant imagines; he made a commonsense argument based on the facts before the jury.

¶ 62    Moreover, counsel provided extensive factual support for the theory that Altshue's trailer was defendant's home. Counsel examined defendant thoroughly on the details of defendant's living arrangements since his release from prison, his contributions toward the household expenses, and his relationship with Altshue, none of which was significantly disputed. And despite defendant's contrary assertions, defense counsel challenged the notion that defendant needed permission to enter Altshue's trailer by eliciting testimony from defendant that he came and went as he pleased. In fact, defendant testified to specific instances when he let himself in and out of the trailer without Altshue's permission.

¶ 63    Ultimately, defendant's hindsighted review of his trial counsel's performance and strategy merely speculates that some other trial counsel might have done things differently and better. But such speculation cannot support a finding of ineffective assistance of counsel. Viewing counsel's performance in its entirety and in the context of the facts and circumstances of the case, we find he rendered the reasonably effective assistance to which defendant was entitled. *Hayes*, 2022 IL App (4th) 210409, ¶ 52.

¶ 64                                D. *Krankel* Inquiry

¶ 65                                1. *Adequacy of Hearing*

¶ 66    Next, defendant claims the trial court's inquiry at the preliminary *Krankel* hearing was inadequate because it only superficially addressed the claims he raised in his *pro se* letter. Defendant points to the following examples to show how the court failed to adequately inquire about the factual bases for his ineffective-assistance claims, particularly the court's failure to

specifically inquire as to (1) every witness on defendant's list, (2) an alleged phone conversation between defendant and Altshue from jail almost a month after the home invasion, (3) mail defendant received at Altshue's address after the home invasion charge, (4) money orders defendant allegedly purchased to pay Altshue's lot rent, and (5) trial counsel's failure to rely on caselaw submitted by defendant.

¶ 67 A trial court's method of inquiry at a preliminary *Krankel* proceeding is flexible. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85.

> "A reviewing court should consider three factors when determining whether a *Krankel* inquiry was sufficient: (1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of [the] defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face."

> *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71.

"None of these factors are mandatory, and no bright-line rule exists about what is a sufficient inquiry and what is not." *Schnoor*, 2019 IL App (4th) 170571, ¶ 71. "The Illinois Supreme Court specifically used permissive rather than mandatory language in describing the utilization of these factors." *Schnoor*, 2019 IL App (4th) 170571, ¶ 71. "The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*." *People v. Roddis*, 2020 IL 124352, ¶ 33.

¶ 68 In this case, the trial court gave defendant all the time he needed to address his

claims of ineffective assistance of counsel. The court engaged both defendant and counsel in dialogue and allowed each side the opportunity to thoroughly explain his respective position. The court was not required to question defendant about all aspects of his *pro se* claims of ineffective assistance; defendant was only one potential source of information. The trial judge presided over all phases of the jury trial, observed the witnesses and defense counsel's representation, and was familiar with the evidence. The court reviewed the contents of the materials defendant submitted, including his *pro se* letter wherein defendant set forth his claims of ineffective assistance in detail. The court also stated it reviewed the relevant aspects of the record and specifically asked defendant during the hearing what, if anything, he wanted to add. Throughout the preliminary *Krankel* hearing, defendant was not reticent to vocalize his complaints about counsel's performance. However, aside from what he stated in his letter, defendant did not provide much further information as to the witness list he sent counsel, correspondence he had with Altshue following his arrest, mail that was delivered to Altshue's address, money orders defendant purchased to pay Altshue's lot rent, and caselaw defendant wanted counsel to rely on.

¶ 69       Thus, based on this record, we conclude the trial court conducted an adequate preliminary *Krankel* inquiry. The court questioned defense counsel about defendant's claims, allowed defendant ample time to provide the court with specific facts about his claims, and found defendant's claims either pertained to trial strategy or lacked merit after considering the contents of defendant's *pro se* letter, the record, and the additional information provided at the hearing. See *Schnoor*, 2019 IL App (4th) 170571, ¶ 71.

¶ 70                          2. *Possible Neglect*

¶ 71       We next address defendant's argument the trial court erred when it failed to appoint him an independent attorney and advance his case to an evidentiary hearing because

defendant established his trial attorney's possible neglect in this case. Defendant's argument in this respect centers on his claim his attorney "fail[ed] to call witnesses or present evidence that would have impeached Altshue." Because we have already found the trial court conducted a proper *Krankel* inquiry, we will not disturb the court's ruling unless its decision was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98.

¶ 72        When a defendant raises an ineffective-assistance claim, the court first should examine the claim's factual basis. *Roddis*, 2020 IL 124352, ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Roddis*, 2020 IL 124352, ¶ 35. The supreme court has made it plainly clear that if the *pro se* allegations pertain to trial tactics, the defendant has no right to the appointment of new counsel. *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). But "if the allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at a hearing on the ineffective-assistance claim. *Roddis*, 2020 IL 124352, ¶ 35. A claim lacks merit when it is misleading, conclusory, legally immaterial, or does not bring to the trial court's attention a colorable claim the defendant's attorney provided ineffective assistance. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 22.

¶ 73        According to defendant's brief, trial counsel should have called several witnesses, including a parole officer, from a list defendant submitted to him of who could have testified that defendant resided with Altshue. When the trial court inquired about defendant's list of witnesses, counsel responded that he "considered [defendant's] witnesses, and [he] determined that none of them would have had testimony that was particularly relevant or would have tipped the case in his direction." The "fact that the Defendant had paroled to [Altshue's] address was established

through his testimony." Counsel also explained he chose not to pursue the other witnesses' testimony because it would have been cumulative in terms of defendant's prior residency with Altshue. In fact, Altshue conceded it during trial, defendant confirmed it, and the jury heard Ramirez's testimony that he had become familiar with defendant while defendant lived with Altshue. The court concluded that this claim lacked merit because counsel's decision whether to call the additional witnesses was a matter of trial strategy. See *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Because the court is not required to appoint new counsel if it finds a defendant's claim relates to a matter of trial strategy, the court's decision not to appoint new counsel based on this claim was not manifestly erroneous. *Nitz*, 143 Ill. 2d at 134.

¶ 74　　　　　Next, defendant claims counsel should have presented evidence of text messages and CashApp payments between him and Altshue after their breakup that could have been used to impeach her testimony that she had him move out the same day their relationship ended. But counsel told the trial court the question of whether Altshue's trailer continued to be defendant's residence was "thoroughly explored and argued." In fact, counsel recalled that it was "precisely the argument that [he] made at trial." Counsel explained the evidence "that [defendant] had been paroled there and that he was receiving mail there was all evidence that he resided there and therefore his entry could not be considered unlawful." He "elicited evidence and testimony from *** Altshue" that defendant "had resided at that address for several months, that he had assisted in paying for the household expenses including the lot rent, and that that had been his place of residence." Defendant also testified to those particulars—specifically, that he had lived with Altshue for almost a year, paid all the household bills, and continued to reside with Altshue after the date she claimed they broke up.

¶ 75　　　　　The trial court ultimately concluded this claim lacked merit because the

- 23 -

determination of what evidence to present on defendant's behalf ultimately rested with trial counsel, and thus, it pertained to counsel's chosen trial tactics. See *Reid*, 179 Ill. 2d at 310. Because defendant's claim related to a matter of trial strategy, the trial court was not required to appoint new counsel, and its decision was not manifestly erroneous. See *Nitz*, 143 Ill. 2d at 134.

¶ 76 In sum, we are unconvinced the trial court made an indisputably erroneous decision. The court discussed the factual bases for the claims with defendant directly and based its decision on its knowledge of counsel's performance at trial and the evidence presented. Because defendant's allegations of ineffective assistance either lacked merit or pertained to trial strategy, we find no manifest error in the trial court's decision not to appoint new counsel. See *Roddis*, 2020 IL 124352, ¶ 35; *Nitz*, 143 Ill. 2d at 134.

¶ 77 III. CONCLUSION

¶ 78 For the reasons stated, we affirm the trial court's judgment.

¶ 79 Affirmed.